Good morning, Your Honors. Eric Fastif of Leif, Cabreza, Hyman & Bernstein, on behalf of the plaintiff and appellant, Stanislaus Food Products Company, with me is my colleague, Mr. Mark Peloton, and Stanislaus' Executive Vice President, Mr. William Butler. I'd like to reserve five minutes for rebuttal. May it please the Court. All right. You'll watch your time. I think you know that that's your complete time. Yes. Yes. May it please the Court. I'd like to begin with a brief fact summary, just a couple of points, and then move right into the citric acid test. So first, this case, the claim, is about a market allocation agreement whereby United States Steel stopped competing on price with UPI for the sale of tin mill products. The motive for this was clear. As U.S. Steel Executive Christopher Neveda, who simultaneously chaired the UPI Executive Management Committee and was a special assistant to the U.S. Steel CEO, he testified that UPI was a long-time economic loser, was unprofitable. So the motive was to make UPI profitable. Defendants executed their market allocation agreement by having UPI charge a super competitive price to Ball, which U.S. Steel did not attempt to compete against. And that high UPI price, in turn, determined the price that UPI charged to Silgin, which passed on that price to Stanislaus through the pass-through CAN contract, as demonstrated in chart attached as Exhibit A to the reply brief. Now, citric acid. Everyone agrees that this case governs this case. And for the two prongs of that test, first, defendants fail to satisfy the first prong of the citric acid test. And that prong requires that a defendant can rebut conspiracy allegations with plausible and justifiable reasons for conduct consistent with proper business practice. Defendants have made no effort whatsoever, because they cannot, to offer any reasons for their conduct. They have not presented any reason why UPI increased its price to Ball by 50 percent when the tin mill product costs decreased dramatically. Defendants haven't presented any reason why U.S. Steel knew that UPI was pricing at a record 29 percent margin, a tenfold increase, yet still priced within 2 percent. Nor have they offered any reason why U.S. Steel could have priced so close without knowing UPI's price. So you're here appealing the district court's determination on what happened here, right, in granting summary judgment. Yes. All right. And the district court applied Matsushita to this case. I guess I'm trying to figure out, it seems like that was an appropriate thing to do, and he considered an economic motive. It seems like you take issue with that. I want to understand why was that incorrect, and why was it incorrectly applied? Even if you think it was, just go ahead and bear with me and assume that it was. Why was it incorrectly applied by the district court? So Matsushita, I agree, is the Supreme Court case that governs, but citric acid is the Ninth Circuit case, which applies Matsushita. But shouldn't Matsushita come first? So it seems like in order to even get into citric acid, you first have to have a notion that there was a conspiracy. And Matsushita, to me, seems to bear on that first question. Do we even have a presumption of the conspiracy in the first place? And I'm struggling with how you even get to citric acid, because it seems like the district court thought you failed to even create the presumption of a conspiracy here. So the district court erred in several areas. First of all, it erred by compartmentalizing the evidence in violation of continental law. Second, it erred by ignoring the dictates of Ciccone Vacuum and American Tobacco Company by trying to piece a conspiracy into a neat and tidy box. Those cases hold that conspiracies evolved. There's no set formula for a conspiracy. Now, as to the economic motive, we did allege and put in the record that the economic motive of U.S. Steel and all the defendants to make UPI profitable. So what? I mean, isn't that actually sort of the foundation of American commerce to make your company profitable? Exactly. So what's – I mean – and that's what they are trying to do. So I don't understand why that – why it's in their interest to not compete. Because U.S. Steel – U.S. Steel is not allowed to – I'm sorry. Go ahead. Just go ahead and argue. Go ahead. U.S. Steel is not allowed to – I'm sorry. You don't want to listen to the questions and understand. No, I mean, we're trying to argue. We're trying to get to the bottom of it, and you want to make your argument. But one of the things that isn't accounted for in here, it seems to me, in terms of a factual issue is these national contracts that exist. And I'd appreciate your comments on how you think those factor into the analysis. Okay. So taking all the questions and points, so two responses. First is we did allege a conspiracy. U.S. Steel is not allowed to conspire with its competitor, UPI. And there is direct evidence of conspiratorial pricing. The evidence is the direct communications from UPI's CEO, Bob Smith, to U.S. Steel's CEO, John Surma, and all the executives at U.S. Steel about UPI's prices, its pricing plans, its contract negotiation provisions, and its contract negotiation prices. That is direct – Could I stop there? It's not a price-fixing case, correct, at this stage? Right. Okay. So to the extent that you're talking about pricing conspiracy as opposed to market allocation, how do you distinguish between those two? I don't have to. American Tobacco says you do not have to distinguish and put a label on anti-competitive conduct. We don't have to put a label on it, but what's – there's a difference between a price conspiracy and a market allocation conspiracy in terms of the underlying facts. I mean, you don't have to put a label on it, but it could fall under the Sherman Act price-fixing. But you say, but that's not what we have here. We have a western market allocation. Isn't that what we have? Right. But a market allocation is also violative of Section 1 of the Sherman Act. Correct. And so an American tobacco company says you don't – Well, you don't have to put – but what is the evidence of a market allocation? The evidence is U.S. Steel not pricing to compete with UPI. And the best example is the pricing to Ball. And if you look at Exhibit B to the reply brief, the chart that shows, with a declining input cost to Timmel Products and all the other market indicia at that time, there was no rational explanation for – or no economic explanation for Ball to be – for UPI to increase its prices to Ball by 50 percent and U.S. Steel to essentially match that price to have it within 2 percent. And that price, of course, triggered the pricing to Silgin. Yeah. So in terms – Your Honor, I want to answer your question about the national contracts. All right. So when examining the implication of those contracts, I think there are two key issues that apply. First, national contracts do not explain matching prices to Ball. And U.S. Steel, secondly, had the economic motive to match UPI's price to Ball. So you can't look at these contracts in a vacuum because everything that – I'd like to ask a question about the motive for a second, though. So I think your argument is that U.S. Steel was going to be better off economically by not competing and getting 50 percent instead of competing, offering a slightly lower price, and maybe getting all the business and getting 100 percent. Is there any analysis in the record that shows that they're actually better off with the 50 percent than the 100 percent that they might get by competing away? A mathematical analysis of the profit margins here? I couldn't find that in the record. I wondered if you could point me to it. I know that the – there's evidence in the record that U.S. Steel stood to gain $100 million a year from not price competing against Ball. And the math for that, I know, is at the fifth bullet point of page 22 of the reply brief. I don't have the – But we need the comparison, right, what they would have made otherwise. Does that exist anywhere? No, but you can definitely understand that with U.S. Steel pricing in such a way to Ball, because, as you recognize, U.S. Steel is a profit-making company. Every decision it made was to be profitable, to inherit the benefits of its shareholders. So if it was giving up market share to Ball via V in the West, it was making up that profit somewhere else. And so it must have made a rational equation. Well, but they might not have been trying to give up the sales. I mean, maybe they were doing the best they could to offer a lower price, and they were hoping they'd get this business, and they failed. But 2 percent price difference isn't going to get you the business with these kinds of contracts, and that evidence is in the record as well. It's important to recognize the district court made a mathematical error, and if you – it said that Ball's – the price, U.S. Steel's price was at 1540, it was higher than the actual prices, and it made the U.S. Steel price to Ball look much greater. It mixed up Crown and Ball in one sentence. Four percent and six percent. Right. Thank you. Well, that's one thing, the four percent and six, but I thought you – at one point, the district court gave the price to Ball and Crown backwards. Right. But it led the district court down a path to show that that price that U.S. Steel made was lower and, therefore, was competitive. But if it's only 2 percent, a 2 percent price difference isn't going to change a customer – a pricing decision. But considering there was a 29 percent profit margin that U.S. Steel knew that UPI had, there was plenty of room for U.S. Steel to price competitively to get that Ball business, not 2 percent. But the contract you're talking about, the Ball – I mean, if you're talking about – are you talking about the Spot contract or something else, the Ball business just generally? Right. But so under the national contracts, how much Ball business was even available to compete for? Because it seemed to me, looking at these contracts, that a huge amount of business was already locked in by these national contracts. And if that's the case, it's not even clear to me how much business was left. The market in the Western United States is substantial, hundreds of millions of dollars. Yeah, but that's where the national contracts – they are shipping to the Western United States. Right. But you've – So that's – so I think you were about to maybe explain your position on that, because that's – it seems to me one of the difficulties in your case is you have national contracts which don't specify the West, but of course, once the orders are placed, a number of them are going to the West. So how do you distinguish that from the so-called Western market? So Ball, Crown, and Silgon, when they make cans for their can customers, such as inefficient. It's like shipping air, and it's too expensive to do. So they want to have their tin plate in California delivered here so they can make their cans here, which is why they all source from UPI here. You don't want to have to pay extra shipping. But what about the evidence that, in fact, there were cans going under the national contracts to the West? A small percentage – there were no cans coming here, but the tin plate was coming here. Tin plate, I mean. Tin plate. But UPI had 71 percent of the market. And during this – the conspiracy allegations here is that U.S. Steel – and this is uncontested – its market share declined after the Ball contracts were entered, down to 4 percent. So it belies the argument that the national contracts in some way are a defense, considering the de minimis market share that U.S. Steel had here. Now, and also answering your question about the national contracts, the lower court raised the issue of them in the context of determining the plausibility of Stanislaus's claim by looking to whether U.S. Steel had economic motive for the alleged agreement. The error in the court's speculation about whether U.S. Steel had economic motive, the record shows that U.S. Steel's profit from the agreement exceeded $100 million in 2009 alone. And as to the court's competitors in UPI would stack up against the U.S. Steel gain from its half share of those record profits. For instance, if U.S. Steel had little Ball TMP business, nothing defendants have put in the record, its risk of lost business from the agreement would be nil. But if Ball had long-term TMP contracts with U.S. Steel's competitors, that business is already locked up. So U.S. Steel had no risk of losing the business because there were already other long-term contracts. It made — when it made its contract with Ball in 2008, 2009, it knew the status of the Ball business. It could have priced to get it, and it chose not to. And it could only — What would be the price? I mean, in other words, we're — if there's a couple percent price differential and you say it's not enough, where do we look to determine, well, what would be enough on the sliding scale of how you determine price? And then let me just add another part of that question is, is it fair enough to look retrospectively at that as opposed to what was happening at the time? It is, because U.S. Steel and Stilgen agreed that the fair price for 10-mil products was the price of hotband steel plus a $350 adder. And then if you look at the chart, chart three attaches Exhibit B to the reply brief, you can see the historical spread and the crazy inversion that happened. When the price of hotband steel, which makes up 70 percent of the price of tinplate, cratered during the start of the recession, there was no economically justifiable reason for U.S. Steel and UPI to raise their prices by 50 percent. That can only be indicia of a conspiracy. I want to add, of course, that the inferences have to go to the plaintiff here in opposing summary judgment, and that the district court was wrong to compartmentalize the evidence. It only looked at some of the evidence, and under continental law, it's required to look at all the evidence together. It can't just look at a — But this is always a challenge that we have on appeal, and that is, you know, the courts always say they look at everything, of course, but in order to actually try to understand the transactions in almost every antitrust case I've seen, and certainly the ones that I tried, you have to compartmentalize the evidence to — or if not compartmentalize, you have to put out aspects of the evidence in the case. So what evidence is there here that the district court didn't look at everything but highlighted some things? So, first, this court has a de novo standard here, so it's not bound by the district court's summaries of its evidence. But the evidence is replete. The industry conditions at the time, the defendants have offered no reason why that in the time of declining demand, commodity products, low input prices, that they should have increased prices. That's together the industry standards, and Dr. Rausser talks about this, about how the market was indicative and ripe — well, it was improper for the defendants to price in a way based on proper economic theory. And in terms of the other evidence, the direct communications between UPI's management and the U.S. Steel's executives who sat on the management committee directly communicating to U.S. Steel's senior executives, their CEO, its COO, and Mr. Koch, who is the head of tinplate sales, there is no reason any of them should have known UPI's prices. Every — the testimony is undisputed by the UPI and U.S. Steel executives here that U.S. Steel is a competitor of UPI, and that that testimony is belied by the evidence. I'd like — Let me ask you another point, and I'll give you enough time for your rebuttal. Thank you. The entire record in this case is sealed. We just had an open argument here. And that's pretty unusual. You know, even in the national security case, we get piecemeal sealing. We don't usually seal the whole record. What's the reason that everything is sealed here, both in the briefs and the record? Well, there are two reasons. One is it was really the price information that was business confidential, and that justified the seal, and plus the nature of the overriding business justifications for the — having the records in the district court sealed, and then the briefing here. But second, it's — frankly, it's just easy — It's easier. — in litigation, if everyone agrees. But I mean, how do you — I don't know how to quite expect us to write an opinion without unsealing, you know, part of this. I think — I think it's just the price information would be the price. All right. Thank you. And my view. All right. So I'll reserve the balance of my time. Thank you. Thank you. A good morning, Your Honor. It's James Martin for the defendants. May it please the Court. Let me start with the district court's analysis under Matsushita and citric acid. It's apparent from the district court's opinion that it followed a path that is mapped out in the case law in both Matsushita and citric acid in looking at whether or not the record supplied first an inference of conspiracy and then whether there were plus factors in the evidence to substantiate that. Having done that, it looked at the evidence individually and then collectively exactly as the case law instructs. And it ended up here, frankly, with the only viable conclusion from the record, which is there's no reasonable inference that any of this evidence of a market allocation conspiracy on the West Coast that actually influenced the price of the Silgen UPI contract, which is where this all ends up. Now, let's spend a little time on that contract for a minute and how it came to be. That wasn't part of the analysis in the opening argument, but it's very revealing for why there is, in fact, no inference of conspiracy possible here. The reason that the Silgen UPI contract was entered into and the reason the price was arrived at had nothing to do with market allocation of any kind. It had to do with Silgen's own investigation of the market and its decision that the price in the UPI agreement was the one that it wanted for long-term stability. It was an arm's-length agreement negotiated for more than a year. No one knew this market better than Silgen. Silgen bought a billion dollars' worth of tin plate a year. It bought it all over the world. And it drove the prices in the bargains that it struck because of that market power. Sotomayor, why specifically did the prices increase in 2008? Prices were increasing all over the market in 2008 and 2009. And sticking up with the thread of Silgen for a minute, that's what its market analysis revealed. Silgen shopped its contract all over the world to European suppliers, to Asian suppliers, to national suppliers. And it said, and its witnesses' testimony was uncontradicted, prices were rising and increasing rapidly. Raw material costs were increasing. Industry prices were going up across the board. And Silgen, in fact, in an effort to deal with that volatile change in the market price, got out ahead of it, started the discussions with UPI, entered the new agreement for a price that ended up to be the second lowest in the market, second only to U.S. steel, which was the lowest. And of course, Silgen had the capacity to buy more from U.S. steel at a lower price and advantage plaintiff in doing so, but it didn't, and it didn't for its own reasons. I think much is made in the testimony about two points. One is about the testimony about the fair agreement or the fair spread, so to speak. And you also had a situation where the spread between the hot band prices and these mill products was, you know, there was an historical graph, so to speak, and then all of a sudden you're off the charts, if you will. So those seem to be at odds with what you're explaining now. Could you justify or talk about that? Certainly. First of all, Your Honor, I want to caution the Court that all of that story is attorney argument drawn from abstract data. It's not based on foundational facts from the players in the drama, and so it's not a way to sustain an inference of conspiracy because, as we know, the mere fact that prices are increasing is neutral. But let's unpack it for a minute. First of all, there was no agreement in the record or otherwise on a fair price formula of a relationship between the cost of hot band steel and the price of the tinplate. In fact, if you look at the record at ER 632 to 637, this is the best indication of it. It's an exchange between Mr. Coff of U.S. Steel and Mr. Arena of Silgan over that very issue. And Coff advises Mr. Arena what the market prices actually are. He disagrees that they're linked to hot band steel, and there was no formula. Now, there also couldn't have been a formula like that in this case anyway as it related to U.S. Steel because U.S. Steel's prices never changed to Silgan. They were the same before, they were the same after, they were set by contract, and they had nothing to do with hot band steel. Now, the other thing about this fair price argument... You're talking about a national contract at this point? Yes, exactly. A 10-year contract that predated and went... A long-term contract. Right. Now, let's go to this fair price scenario for a second because it's not actually capable of being substantiated either. The idea of this fair price was, according to the plaintiffs, U.S. Steel was supposed to slide into the market at lower prices and compete for greater market share. Well, it couldn't do that. The national contracts that it had didn't allow it to dictate where its product would go, and those contracts set the price that it could charge. This was not the typical competitive situation. Second... On that point, I think the argument was made, however, that if you look at the practicality of shipping and production, that that belies the statement that the national contracts somehow really are national in scope. Actually, Your Honor, there's no foundation for the observation that's more attorney argument, and the fact of the matter is, and Silgan said this, they traded the product all over the nation all the time. They moved it from east to west, west to east, where they wanted it, at their direction. Mr. Arena was clear that's the way they did it. The rest of the market evidence is that the product did move nationally. U.S. Steel only had 40 percent of the entire market, so in addition, not only did the product move, it wasn't coming only from the conspirators here. They had no ability to control this market. Thirty percent of it was foreign, so the idea that they could even allocate is beside the point. But coming back to this fair price argument for a minute, not only could U.S. Steel not come in at a fair price, at its whim, but it was in the market at lower prices than everyone else on every contract. That's the competitive difference here. So if there were market forces out there that were changing the prices, U.S. Steel was priced in a way to take advantage of that, and there's no evidence in the record that those low prices were somehow artificial or otherwise. But let's take that all and say we're artificially high or anything else. There's no testimony to substantiate that. But let me just take it one step further, and let's put in the notion that U.S. Steel prices were unfair and unfairly high. That's not an antitrust issue. The question is were those prices what the market would bear, and the answer to that is yes. They were as competitive as anybody's. They were as low as anybody's. There is no antitrust violation from putting the highest price in the market that you possibly can. The U.S. Supreme Court has told us that, and the Baby Food Third Circuit case tells us that. When you can't do it is when you have an unlawful agreement, but that's the evidence that's absent. Let's go to the unlawful agreement then. In particular, Stanislaus is pointing to this exchange between the high-level people at U.S. Steel and UPI, and there not being a walled-off partnership in terms of the actual either pricing or the operation of UPI. So I would direct your attention to that evidence and ask you why that wouldn't be taking it in the light most favorable to Stanislaus sufficient evidence. Okay. So first of all, Your Honor, there's no evidence to substantiate the litany that's in the brief about the exchange, about the motives, and about the intent. Please unpack the evidence that's cited for that, and you'll see two things. First, you'll see that there was an exchange of price information amongst the joint ventures and the principals, but that is record neutral. I'm sorry. It's record neutral and I trust neutral. I'm sorry. The joint ventures clearly all had an interest in UPI being profitable. It was losing money on every contract that it had, and the notion that there would be some discussion about raising prices was not only not surprising, it was essential to UPI's survival. Now, then, if we look at what information was actually exchanged and who controlled the pricing, we don't find evidence that U.S. Steel instructed or controlled the prices that UPI charged. The record evidence is that UPI alone set those prices, not U.S. Steel, not and every witness who was there. Well, there's a difference between an entity, quote, setting the price and communications between entities as to what that price might be. Well, that's true, Your Honor, but taking both those things, again, from an antitrust perspective, even if competitors exchange price information, that's antitrust neutral. So you need You have to do something with it. It has to have a causation. Yes. There has to be an unlawful element to it, and that's the second part of the record that's missing here. They have no evidence that says that U.S. Steel's prices changed in any respect because of this information, and the only evidence that they cite to are the two spot transactions, which clearly are distinguishable here and clearly were one-off transactions where U.S. Steel Well, that's exactly I'm sorry. Is that because they pointed, the penalts have come forward with what sounds like highly suspicious documents or sounding like highly suspicious documents, references to greed and what U.S. Steel is doing and undue attention to a small supply order to Crown. Why don't these documents support a reasonable inference of collusion? Well, let me go for two reasons. First, none of those documents are related to the national contracts that are actually supplying the market, and U.S. Steel Well, I have a question about that. Sure. So in the UPI-Silgin contract, Silgin had a guarantee of the lowest price, right? So if — could a spot sale trigger the lowest price guarantee, or is it only the long-term contracts that trigger? Right. The regular contract. But the spot Is that — sorry, is that in the record? So I tried to read the contract to figure that out, and I had trouble figuring that out. No, I don't know that there is some — I'm not aware that there is direct testimony that supports that in the record. But your understanding is the spot sale couldn't even trigger the lowest price guarantee. Correct. But assuming that that spot price is higher, and it's evidence that U.S. Steel raised its prices in that instance, there's a perfectly rational explanation for it. First, it was a one-off transaction where U.S. Steel could command a higher price, and U.S. Steel's national price for its regular sales to Crown, Ball, and UPI was lower than the spot price. The second thing was that U.S. Steel was able to charge that price because UPI had refused the business and didn't want it. And so U.S. Steel did what any competitor would do. It stated a price to Crown. Crown said OK, and it sold it, a one-off deal. Why did it get the CEO's attention, this deal? If it was such a tiny deal and so one-off, why did it get to such high levels? You know, I don't know that anybody provided a motive or indication for that. There was sensitivity in U.S. Steel about the prices that you could get in the market. And the U.S. Steel executive was wondering, how can we price it this high, and this was the colloquy, with UPI there? Why aren't they getting this? How in the world did we get this? It was a good thing, right? And then the explanation was UPI had refused the business, and he said, OK, I get it. It's a one-off, which is exactly what it was. But the testimony, it's not a supply issue. It's a price issue? Yes. It was a – I'm sorry. It was a – in the spot market, the record is clear that you can command prices that are aberrant to the market and usually higher because the person who needs the product is oppressed. Their regular supplier isn't giving it to them or whatever. And that's all that happened. And as I said, that's antitrust neutral on this record. There is nothing else. But what facts would support a reasonable inference of collusion? I mean, you know, you don't deny that U.S. Steel recouped profits from UPI's increased prices, and it seems like you don't deny that U.S. Steel's prices rose in parallel to UPI's. We have this spot transaction. What more do you need for a reasonable inference of collusion? Well, I would point the Court to the cases that plaintiffs cite favorably as supporting a conspiracy, and I would distinguish those from baby food and, say, citric acid, OSC v. Apple on the other side. Look at that as the spectrum. If you look at the cases that plaintiff relies on, you're going to see memos, you're going to see discussions about stabilizing, you're going to see direct participants in the purported conspiracy exchanging the kind of information that substantiates an inference. In this record, Your Honor, and I cautioned the Court when I first stood up on this, that evidence is supplied by attorney argument. It is not supplied by the kinds of memos, retaliation, conduct against economic motive, direct discussions by participants about stabilizing prices. None of that is being exchanged between these defendants with reference to a market allocation conspiracy. Forget about the prices for a second. A market allocation conspiracy. Well, I understand their argument, of course, to be that, you know, you don't have to always categorize things, and that pricing can be indicia of a market allocation. So I'm reading, though, as I understand what the claim is here, that U.S. Steel did not seek or get business in the Western U.S., thus allocating the T&P market to UPI. And do you agree that that actually is the narrow issue that was left after many things fell by the wayside? We don't agree that it's a Western market. It's, in fact, a national market. But let's narrow down to that. Let me concede that. I know you don't agree that it's a Western market, but that is their claim. Right. Let me make it easy. Three things on that. U.S. Steel's tonnage to the West went up after 2006. It was clearly, it was shipping more than before the conspiracy. U.S. Steel's tonnage to Silgon went up after 2006. It was shipping more than before, I mean, during the conspiracy. But went down then in 2008 or 2009, right? It went up and then down, right? It did, but it was still more. That's the point. U.S. Steel never refused to ship to the West Coast when anybody asked. U.S. Steel never refused an order. There was no one who said that they ever said, oh, get it to UPI. Nothing like that. U.S. Steel complied with its contracts, shipped. It wanted more business. Michael Arena of Silgon said, every year that I held my job, U.S. Steel wanted to sell me more tinplate. They didn't like the price. U.S. Steel was too low, but they wanted to sell more. And Arena said, no, you're not reliable, and I want diverse sources of supply to protect my business. End of analysis. But the idea that U.S. Steel was not competing during this period of conspiracy is refuted directly by the record. It didn't exit the market, and it stayed in it. I want to do one minute on the crown ball price that got so much play. Interestingly, you'll find that crown and ball are in the third amended complaint only three times or twice, none with respect to price, none with respect to their contracts. This is an invention of appeal. There is no evidence to substantiate a relationship between the contracts that ball had with UPI, that ball had with U.S. Steel, that ball had, or that those by virtue of the Most Favored Nation Clause had any effect on the price that UPI charged to Silgan. As I said before, we know why UPI has the price it does with Silgan, because Silgan negotiated that price. Now, on the Most Favored Nation Clause, the fact that it's there is also antitrust neutral. It's a perfectly reasonable contract provision. You will search the record in vain, Your Honors, for any evidence that connects that clause to any price in any contract that leveraged Silgan, drove the price to Silgan, drove the price in the market at all. What you will find is that the market forces allowed those prices to be charged. U.S. Steel charged them. There is nothing wrong with that. And U.S. Steel's prices still were the lowest in the market across the board, so it was competing on price. You can't make a conspiracy out of that. Thank you. Thank you. It sounds to me, Your Honors, that there's enough factual disputes that this requires to go to a jury. That's what I just heard. Do you have evidence in the record that says that the crown spot market sale could have triggered the Most Favored Nation Clause? No. But that spot, but looking at that piece of evidence with all the other evidence, because the inference has to go to the plaintiffs, there's no reason for U.S. Steel to charge an astronomical price to Crown when the CEO of U.S. Steel was concerned that UPI was full and wanted to know why it was getting that business. That inference has to go to the plaintiffs. But you could have asked in a deposition. I mean, it seems like your major theory right now is that this spot market sale is the evidence of the conspiracy, but you never asked anyone in a deposition whether it actually mattered? The — that price, that sale was about a hundredth of U.S. Steel's national T&P sales that year. And what we asked was why it was gathering the attention of the CEO, the COO, and the — Mr. Cope, who is the head of U.S. Steel's template sales. And if you look at that piece of evidence in conjunction with the other — And what was the answer to why they were paying attention? Because they wanted to know what was going on with UPI's business. They didn't understand why Crown was coming to them. And then — And so why isn't that a totally neutral, fine explanation? Because you don't look at it in isolation. You have to look at it in conjunction with all the others, all the other evidence. But isn't — you know, isn't a spot market sale in and of itself is an irregular sale to some degree when you have national long-term contracts, right? Yes. So the fact that the pricing ends up where it is in and of itself doesn't make an antitrust violation of market allocation, does it? But there's nothing in the record that UPI refused that business. That was an error, I believe, counsel made. He didn't cite anything for his proposition. And it was consistent with the defendants here, where they never offer a justification for their conduct. And it's a characterization of that evidence instead of the weight of that evidence going to the plaintiffs. All right. I think it's also important to note that the prices were not increasing in late 2008. Yes, they had been increasing earlier, but once the recession hit, the prices for template and hotbed steel were increasing dramatically, and the contracts didn't reflect the actual market conditions. In terms of the fair price, that is not — That is another question I had in terms of you don't necessarily look at market conditions with, you know, that type of precision when your pricing may actually be accounting for what's happening in the market over a period. So is there somewhere we should look to support your argument that just because the prices weren't increasing, that there should have been a different price? Yeah. I think Dr. Rouser addresses the market conditions exhaustively. And just a point about that, I know the district court was upset with Dr. Rouser, and yes, we could have had better page designations, but we did point to the summary, which was right opposite the table of contents. It was not — it was not just dumped into the record for the district court to find on its own. Well, I understand. But there is — you know, you were pointing to the table of contents, and then Dr. Rouser has quite a bit, as I read through it, if you look at each of the sections, he has a lot of — in every section about a lot of things. So you can understand why the district court — But for the district court to characterize an opinion as unsubstantiated just isn't  It was a substantial opinion, and it's detailed. Right. But, of course, we're — as you appropriately acknowledge, we're looking at de novo in any event. Right. Right. If I could just comment briefly about the fair price point. Mm-hmm. That is not an attorney created. Those are from U.S. Steel's documents and Mr. Arena's testimony. At ER 1073, that's a U.S. Steel internal minute — minutes of a meeting of its negotiations with Silgan, where they discussed what the fair price was. And Mr. Arena testified that the fair price was the hot band steel plus the $350 adder. That's at ER 633 and 635. So allegations that this is attorney created or information isn't in the record, that's just not true. The inferences go to the plaintiffs, and the defendants have not met their burden under the citric acid first prong test to justify their conduct. There is overwhelming amount of evidence. If you look in our reply brief from pages 21 to 24, it is replete with bullet points that list out all the evidence. Something happened here. It could only be a conspiracy. It could only be U.S. Steel agreeing with UPI not to price compete in the West, and those high prices directly impacted my client Stanislaus. This isn't, by the way, some penny-ante case. This is tens of millions of dollars. Stanislaus is the largest fresh-packed tomato canner in the Valley. It is a huge business, and it buys tens of millions of cans a year. So this isn't some isolated, you know, business dispute. It is a serious matter. The conspiracy evidence here is not antitrust neutral. That, again, is attorney conjecture, and it's not the appropriate inference that the Continental Law and just the general jurisprudence about summary judgment is supposed to guide the district and the appellate courts. Are there any other questions? Thank you. Thank you, Your Honors. We request you reverse that. There's a lot of material here, which we'll spend some more time on. We appreciate both of the arguments. Very helpful this morning. And the case just argued of Stanislaus v. USS Posco is submitted.
judges: McKeown, Murguia, Friedland